```
              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW HAMPSHIRE
```

<u>Harbour Capital Corporation</u>

       v.                                  Case No.  08-cv-506-PB
                                               Opinion No. 2011 DNH 019
<u>Allied Capital Corporation, et al.</u>

### MEMORANDUM AND ORDER

Harbour Capital Corporation ("Harbour") has filed a complaint against Allied Capital Corporation ("Allied") and Financial Pacific Company ("Financial Pacific") alleging tortious interference with contractual relations and unfair trade practices under New Hampshire Revised Statutes Annotated ("RSA") § 358-A:2. Financial Pacific moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and Allied seeks judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Harbour objects. For the reasons set forth below, both motions are granted in part and denied in part.

## I. BACKGROUND

Harbour, a New Hampshire corporation, is in the business of equipment leasing and financing throughout the United States. Allied Capital, headquartered in Washington D.C., is a provider of debt and equity financing to private and middle market companies.1  Financial Pacific Company, a commercial finance company, is a subsidiary of Allied.  Financial Pacific Leasing, LLC ("FinPac"), a direct provider of commercial equipment leases, is itself a wholly owned subsidiary of Financial Pacific.  Allied also owns a controlling interest in DCC Holdings, whose wholly owned subsidiary, Direct Capital Corporation ("Direct Capital"), competes with Harbour in the business of equipment leasing and financing.

On August 2, 2001, Harbour and FinPac entered into a Broker Agreement.  Under the agreement, Harbour referred lease transactions to FinPac in exchange for a commission.  The agreement was terminable at-will by either party upon thirty

---

[1] On April 1, 2010, Allied merged with Ares Capital Corporation.  Because the merger post-dated all relevant dates in this litigation, I will continue to refer to the defendant as "Allied."

(30) days' notice.  Over the next seven (7) years the agreement was mutually profitable for both parties.2

In April 2007, Harbour commenced litigation against Direct Capital and others in Rockingham Superior Court.  A little over a year later, on July 24, 2008, Chris Broom, a director of Direct Capital, exchanged emails with John Fruehwirth, an Allied and Financial Pacific director, regarding Harbour Capital's ongoing business relationship with FinPac.3  Three months later, on October 16, 2008, the FinPac board, comprised of directors associated with Allied and Direct, unanimously agreed to recommend that FinPac terminate its Broker Agreement with Harbour.4  After informing Chip Kelley, the President of Harbour Capital, that it was terminating the brokerage relationship, Terey Jennings, the Senior Vice President FinPac, sent a follow-up letter in which Jennings noted that "[w]e [FinPac] are being instructed by our parent company, Allied Capital, to discontinue our relationship with Harbour Capital Corporation.  This is due

---

[2] Harbour was the number eight broker nationwide for FinPac.

[3] The exact details of the conversation are not clear.

[4] Allied had previously asked FinPac to terminate its relationship with Harbour, but FinPac had not done so.

to ongoing legal issues Harbour Capital is having with another one of the companies owned by Allied Capital."

Feeling that it had been unfairly punished by Allied for its litigation against Direct, Harbour brought suit against Allied in this court on December 8, 2008, claiming that Allied had tortuously interfered with its contractual relations with FinPac and engaged in unfair trade practices by instructing FinPac to terminate its relationship with Harbour. Financial Pacific was later added as a defendant after Allied notified Harbour that it considered Financial Pacific a necessary party.

## II. STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must make factual allegations sufficient to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible when it pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

5

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citations omitted).  In deciding such a motion, I must accept all well-pleaded factual allegations in the complaint as true, drawing all reasonable inferences in the plaintiff's favor.  Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001).  An inference that a plaintiff asks the court to draw from pleaded facts will not fall short under the plausibility test merely because "other [] undisclosed facts may explain the sequence better."  Sepulveda-Villarini v. Dep't of Educ. of P.R., Nos. 08-2283, 09-1801, 2010 WL 5093220, at *4 (1st Cir. Dec. 10, 2010).

"The standard for evaluating a Rule 12(c) motion for judgment on the pleadings is essentially the same as that for deciding a Rule 12(b)(6) motion."  Pasdon v. City of Peabody, 417 F.3d 225, 226 (1st Cir. 2005).  The court again views the facts contained in the pleadings in the light most favorable to the nonmovant and draws all reasonable inferences in his favor.  Zipperer v. Raytheon Co., 493 F.3d 50, 53 (1st Cir. 2007), cert. denied, 128 S. Ct. 1248 (2008).  Judgment on the pleadings is proper "only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable

judgment."  Id. (quoting Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 54 (1st Cir. 2006)).

### III. ANALYSIS

#### A.   Intentional Interference With Contractual Relations

Counts I and III of Harbour's Amended Complaint allege that Allied and Financial Pacific tortuously interfered with Harbour's contractual relations with FinPac.  To prove an intentional interference claim, Harbour must establish that: (1) it had an economic relationship with FinPac; (2) Allied and Financial Pacific knew of the contractual relationship; (3) Allied and Financial Pacific intentionally and improperly interfered with this relationship; and (4) Harbour was damaged as a result of the interference.  See Singer Asset Fin. Co. v. Wyner, 937 A.2d 303, 312 (N.H. 2007).

Defendants argue that Harbour's intentional interference claims fail because the pleadings do not support Harbour's contention that defendants acted "improperly" when they directed Harbour to terminate its contract with FinPac.  I reject this argument because it is based on an insufficiently deferential reading of Harbour's complaint.

7

Defendants correctly note that a parent corporation ordinarily will not be deemed to have improperly interfered with an at-will contract between a subsidiary and a third party if the parent causes the contract to be terminated to protect the parent's interests from being harmed by the contract.  See Restatement (Second) of Torts § 769 (1979).[5]   The complaint in this case alleges, however, that the defendants improperly interfered with the contract and pleads facts that plausibly support the conclusion that defendants acted solely to punish Harbour rather than to protect their own interests.[6]  A parent corporation is not free to terminate a subsidiary's contracts solely to punish a business competitor.  See Restatement (Second) of Torts § 769 cmt. e (1979)(noting that conduct directed for the "gratification of [one's] ill will" is improper).  Because Harbour's complaint can plausibly be construed to support its contention that defendants acted with an improper motivation when they directed FinPac to terminate

---

5  By its terms, Section 769 applies only to prospective contractual relations.  The Restatement, however, treats an at-will contract as a prospective contractual relation.  See Restatement (Second) of Torts § 766 cmt. g (1979).

6 The complaint alleges that the contract between Harbour and FinPac was mutually profitable and that the contract was terminated because of Harbor's lawsuit against Direct Capital.

the contract, defendants are not entitled either to dismissal for failure to state a claim or judgment on the pleadings with respect to their intentional interference claims.  See Sepulveda-Villarini, 2010 WL 5093220, at *3.

**B.   RSA § 358-A:2**

In Counts II and IV of its Amended Complaint, Harbour alleges that Allied and Financial Pacific violated New Hampshire's Consumer Protection Act ("CPA"), RSA § 358-A:2, by "instructing FinPac to discontinue its relationship with Harbour Capital due to the ongoing legal issues Harbour Capital is having with Direct Capital."  Am. Compl. ¶¶ 47, 58.  As with its tort claims, Harbour's CPA claims are based on allegations that Allied and Financial Pacific instructed FinPac to terminate its relationship with Harbour in retaliation for the Habour/Direct Capital litigation.  Allied and Financial Pacific both argue that the alleged action fails to qualify as an "unfair or deceptive act or practice" under the statute.

RSA § 358-A:2 makes it "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."  N.H. Rev. Stat. Ann. § 358-A:2 (2004).  The statute

then delineates a non-exhaustive list of specified acts deemed to be unfair or deceptive.  See id.  For conduct not captured by the enumerated categories, the New Hampshire Supreme Court has indicated that it must either "be of the same type as that proscribed in the enumerated categories," State v. Sideris, 951 A.2d 164, 168 (N.H. 2008), or "attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce," State v. Moran, 861 A.2d 763, 765 (N.H. 2004).  In addition, the New Hampshire Supreme Court also looks "to the federal courts' interpretation of the Federal Trade Commission Act (FTCA) for guidance."  Moran, 861 A.2d at 766.  "Although RSA 358-A:2 is broadly worded, not all conduct in the course of trade or commerce falls within its protection." Barrows v. Boles, 687 A.2d 979, 986 (N.H. 1996).

     As previously noted, at the heart of Harbour's Amended Complaint is the allegation that Allied and Financial Pacific acted with an improper motive, namely retaliation for the Harbour/Direct Capital litigation, when they instructed FinPac to terminate its at-will relationship with Harbour.  Based on this illicit motive, Harbour contends that the otherwise lawful

termination of an at-will agreement should be considered an unfair or deceptive trade practice.

The termination of an at-will agreement, even with the motive alleged, does not, without more, amount to an unfair trade practice under RSA § 358:A-2.  It is clearly evident, and Harbour does not argue otherwise, that the alleged conduct does not meet any of RSA § 358:A-2's enumerated categories.  See N.H. Rev. Stat. Ann. § 358:A-2.  Nor is it analogous to any of those categories.7  See Sideris, 951 A.2d at 168. Recognizing this challenge, Harbour ostensibly focuses its argument on the more enigmatic FTCA standard. Even here, however, Harbour fails to offer any authority or explain how the alleged conduct qualifies as an unfair or deceptive act.

In order to determine whether actions are unfair or deceptive under the FTCA one must ask:

> (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the

---

7 Neither does Harbour adequately argue that the alleged actions would qualify under the rascality test.  Instead, after restating the facts alleged in its Amended Complaint, Harbour merely asserts in a conclusory fashion that "[t]hese allegations easily satisfy the rascality test under New Hampshire law."  This is not sufficient.  See Bell Atlantic v. Twombly, 550 U.S. 544, 561 (2007).

> common law, or otherwise-whether, in other words, it is within at least the penumbra of some common-law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] [8] (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

Moran, 861 A.2d at 766.

Harbour has failed to offer any proof that the alleged conduct "offends public policy as it has been established by

---

[8] Harbour contends that they need only meet one of these factors to be successful. It is not entirely clear whether the three FTCA factors should be considered in the conjunctive or the disjunctive. See FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d 93, 107 (1st Cir. 2009) (using conjunctive); Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 243 (1st Cir. 2005) (using conjunctive); but see Chroniak v. Golden Inv. Corp., 983 F.2d 1140, 1146 (1st Cir. 1993) (using disjunctive). Based on the language surrounding the applicable test, the better reading is to read the factors in the conjunctive. See Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising in Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324, 8355 (July 2, 1964) ("[i]f *all* three factors are present, the challenged conduct will surely violate Section 5 even if there is no specific precedent for proscribing it. The wide variety of decisions interpreting the elusive concept of unfairness at least make[] clear that a method of selling is exploitive or inequitable if it is exploitive or inequitable *and if, in addition to being morally objectionable, it is seriously detrimental to consumers or others*.")(emphasis added). Additionally, requiring only one of the factors be met would lead to an overly broad reading, as *any* practice causing substantial injury would be covered, whether it is deceptive/unfair or not. As a result, I apply these factors in the conjunctive.

statutes, the common law, or otherwise." See id. Put simply, the contract between Harbour and FinPac was terminable at-will. Therefore, the agreement was terminable for almost any reason or no reason at all. See Porter v. City of Manchester, 849 A.2d 103, 113-14 (N.H. 2004)(explaining New Hampshire law regarding analogous at-will employment contracts). Additionally, Financial Pacific and Allied generally have the right to pick and choose those with whom they will do business. Serpa Corp. v. McWane, Inc., 199 F.3d 6, 16 (1st Cir. 1999)("a refusal to deal, without a showing of monopolistic purpose or concerted effort to hinder free trade, is not an unfair trade practice under G.L.C. 93A [the Massachusetts Consumer Protection Act], and is therefore not actionable")(quoting PMP Assocs., Inc. v. Globe Newspaper Co., 321 N.E.2d 915, 919 (Mass. 1975); Chase v. Dorais, 448 A.2d 390, 391 (N.H. 1982)(noting that the New Hampshire Supreme Court turns to the "well developed body of law" construing the analogous Massachusetts Consumer Protection Act). At best, Harbour has alleged an ill-willed termination of an at-will agreement, an action which does not generate an unfair trade practices claim without additional facts implicating public policy concerns that are absent from Harbour's complaint. See

Porter, 849 A.2d at 114; Hobin v. Coldwell Banker Affiliates, Inc., 744 A.2d 1134, 1141 (N.H. 2000)(affirming dismissal of RSA § 358-A claim where the defendant exercised option permitted under agreement); Barrows, 687 A.2d at 986 ("[t]he defendants' conduct simply falls within the rough edges of commercial lending").

While Harbour cites a panoply of authorities, it fails to adequately allege that Allied and Financial Pacific's conduct amounted to an unfair trade practice under RSA § 358-A:2, as opposed to simple "selfish bargaining and business dealings" that would not "raise an eyebrow of someone inured to the rough and tumble world of commerce." Barrows, 687 A.2d at 986-87. As a result, Harbour's RSA § 352-A:2 claims are dismissed.

## IV. CONCLUSION

For the foregoing reasons, I grant Allied's motion for judgment on the pleadings (Doc. No. 65) and Financial Pacific's motion to dismiss (Doc. No. 30) as to Counts II and IV respectively and deny their motions as to Counts I, III and V[9].

---

[9] Count V is a claim for "Enhanced Compensatory Damages." "Such damages are termed 'liberal compensatory damages,' and are available only in exceptional cases." Aubert v. Aubert, 529 A.2d 909, 914 (N.H. 1987). One such exception is when there is

14

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

February 3, 2011

cc:   William E. Christie, Esq.
      Steven M. Gordon, Esq.
      Michael Himes, Esq.
      James F. Ogorchock, Esq.
      John-Mark Turner, Esq.

---

"ill will, hatred, hostility, or evil motive on the part of the defendant." Id. Defendants' challenge to this count has not been adequately briefed and I decline to take it up at the present time.